UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NVIEW HEALTH, INC.,

    Plaintiff,

v.                                Case No. 8:21-cv-385-VMC-TGW

DAVID V. SHEEHAN, M.D.,

    Defendants.
_____/

**ORDER**

This matter comes before the Court upon consideration of Plaintiff Nview Health, Inc.'s Motion for Summary Judgment (Doc. # 121), Nview's Daubert Motion to exclude the expert report and testimony of one of Dr. Sheehan's expert witnesses (Doc. # 122), Defendant Dr. David V. Sheehan's Motion for Summary Judgment (Doc. # 124), and Dr. Sheehan's Daubert Motion to limit the testimony of two of Nview's experts (Doc. # 123), all filed on July 21, 2022. Dr. Sheehan has responded to both of Nview's Motions (Doc. ## 125; 127), and Nview has replied to its Motion for Summary Judgment, (Doc. # 129). Nview has responded to both of Dr. Sheehan's Motions (Doc. # 126; 128), and Dr. Sheehan replied to his Motion for Summary Judgment. (Doc. # 130). For the reasons that follow, Nview's Motion for Summary Judgment is granted to the extent stated

1

herein, Nview's <u>Daubert</u> Motion is denied, Dr. Sheehan's Motion for Summary Judgment is granted to the extent stated herein, and Dr. Sheehan's <u>Daubert</u> Motion is denied.

I.  **Background**

   A. **The Contract Dispute**

Dr. Sheehan is a doctor, Harvard-trained neuropsychiatrist, and Distinguished University Health Professor Emeritus at the University of South Florida Morsani College of Medicine. (Doc. # 124 at 2). He created the technology at issue in this case. (<u>Id.</u>). The technology consists of "widely used mental health assessment instruments, including the Mini International Neuropsychiatric Interview (M.I.N.I.), which helps researchers and physicians diagnose a wide array of the most common mental health disorders." (<u>Id.</u>). Dr. Sheehan granted Nview an exclusive license to his technology on February 15, 2016. (<u>Id.</u> at 4).

Nview is a software company that distributes versions of Dr. Sheehan's tests in several different formats. (<u>Id.</u> at 3-4). From February 2016 to September 2019, David Schuster was Nview's President, and Thomas Young was its CEO. (Doc. # 124 at 3). Dr. Sheehan was an Nview founder and was the company's Chief Scientific Officer. (Doc. # 121 at 4).

Nview and Dr. Sheehan entered into a License Agreement effective February 15, 2016 (the "February Agreement"). (Doc. # 121-2). The February Agreement includes the following provisions:

> 1.2. "Field" means behavioral healthcare and healthcare technology specifically in **any format.** This includes all commercial and research applications for these technologies.
> 2.1.1. Sheehan hereby grants to Nview a worldwide, transferable, **exclusive license,** with the right to sublicense in multiple tiers, to develop, make, have made, **use, sell, offer to sell,** import, reproduce, distribute, modify, display and **otherwise commercialize** products utilizing the Sheehan Technology [as defined] in the Field.
> 2.1.3. Sheehan shall retain the right to continue to use and bill for the use of the Sheehan Technology in paper format[.]

(Id. at 2, 4) (emphasis added). The February Agreement also limited Dr. Sheehan's right to "[g]rant a license under the Sheehan Technology in the Field of Use or authorize any party to use the Sheehan Technology in the Field of Use, except in paper format for all of his structured diagnostic interviews and rating scales." (Id. at 4).

The February Agreement also contains a provision that limits the parties' liability. It states that "neither Dr. Sheehan nor Nview shall have any liability to the other party for any indirect, special, consequential or punitive damages, including loss of profits . . . incurred by any party, whether

3

in an action in contract (including breach of warranty), tort or otherwise." (Doc. # 121-2 at 7).

Dr. Sheehan represented that he reviewed the February Agreement with his attorney, and it was in line with what the parties discussed. (Doc. # 121 at 3). The February Agreement contains an integration clause which states that it "constitutes the complete understanding between the parties with respect to the terms and conditions set forth in this Agreement and supersedes all previous written or oral agreements and representations" and "may be modified only in writing that expressly references this Agreement and is executed by both of the parties to this Agreement." (Doc. # 121-2 at 7-8).

Nview's corporate formation documents, effective as of August 12, 2016, included a document entitled "Action by Unanimous Written Consent of the Board of Directors" ("Unanimous Consent") and a set of related exhibits. (Doc. # 124 at 6). Dr. Sheehan had previously raised with Mr. Schuster and Dr. Young concerns that the February Agreement did not allow him to retain exclusive rights to his technology in paper and PDF formats. (Doc. # 124 at 4). Mr. Schuster and Dr. Young told Dr. Sheehan that the License Agreement would be updated to include the language Dr. Sheehan was seeking.

4

(Id. at 5). In the Unanimous Consent, Nview's Board "adopt[ed] and approve[d] a series of resolutions," including one which expressly directed Mr. Schuster to execute a license with Dr. Sheehan that was "in substantially the form" of a term sheet attached as an exhibit to the Unanimous Consent. (Id.). One provision in the August 2016 Term Sheet states that Dr. Sheehan "shall retain the right to continue to use and bill for the use of his Technology in paper and PDF format" and "shall retain the exclusive copyrights, ownership of and all rights [to the IP] in these formats." (Id. at 7).

In August 2016, the Nview Board approved a Founder's Stock Purchase Agreement for each of the three cofounders and directors of Nview as part of the Unanimous Consent. (Id. at 8). Dr. Sheehan's Stock Purchase Agreement expressly incorporated four exhibits, including a new License Agreement. (Id.). The August Agreement includes the following provisions:

> 1.2 "Field" of use means Behavioral Healthcare and Healthcare Technology specifically in **any electronic or mobile format.**
> 1.7 "Sheehan Technology means all patents, patent applications, copyrights, trade secrets, inventions, know-how, trademarks and other intellectual property rights of Dr. Sheehan to the extent and only when any of these are used **specifically in any electronic or mobile format.**
> 2.1.3 Dr. Sheehan shall retain the right to continue to use and bill for the use of his Technology in **paper and**

> **pdf format** for all of his structured diagnostic
> interviews and rating Scales and shall retain the
> exclusive copyrights, ownership of and all rights to all
> his scales, and structured diagnostic interviews and
> record tracking systems in these formats.

(Doc. # 121-9 at 9) (emphasis added).

Both the February and August Agreements contain a provision entitled "Press Releases," which states that "[n]either party shall make any public statements or issue any press releases relating to this Agreement without the prior approval of the other party." (Id.; Doc. # 121-2 at 9).

The parties executed an amendment to the License Agreement on April 3, 2019. (Doc. # 121-6). The April Amendment includes the following provisions:

> 1.2 "Field" means all fields of use, **in any format**,
> including behavioral healthcare, healthcare technology
> and commercial research applications.
> 2.1.1 Dr. Sheehan hereby grants to Nview and its
> affiliates a worldwide, perpetual (subject to the
> termination provisions set forth herein), royalty free,
> fully paid, transferable, exclusive license, with the
> right to sublicense in multiple tiers, to develop, make,
> have made, use, sell, offer to sell, import, reproduce,
> distribute, modify, display and otherwise commercialize
> products utilizing the Sheehan Technology in the Field.

(Id. at 2) (emphasis added). The April Amendment states that it amends the "License Agreement ('the Agreement') dated as of February 15, 2016," and that it "together with the [February License] Agreement, as amended, all agreement referenced therein and all exhibits thereto represent the

6

entire agreement of the parties with respect to the subject matter herein." (Id. at 3). The April Amendment removed milestones that were contained in the February Agreement. (Id. at 2).

On June 24, 2019, Nview and Dr. Sheehan entered into a consulting agreement. (Doc. # 121-7). The Consulting Agreement states that "[a]ll capitalized terms in this Exhibit B shall have the meaning provided in that certain License Agreement between the Company and Dr. Sheehan dated February 15, 2016 as amended." (Id. at 13). In the June 23, 2019, email providing the Consulting Agreement, Dr. Young wrote to Dr. Sheehan that Nview "clearly recognizes that any 'new' scales, changes to old scales or interviews all remain your property and you have exclusive rights to the paper versions." (Doc. # 124-10 at 583). Dr. Young stated that "this is now in two places the licensing agreement we previously executed and this consulting agreement." (Id.).

In September 2019, BIP Capital, Inc., a venture capital firm, invested $4.65 million in Nview and installed James Szyperski as the new CEO. (Doc. # 124 at 11). In 2019, Nview was dealing with a "technical mess" related to its software. (Id.). During Mr. Szyperski's tenure from June 2019 to

February 2022, Nview did not turn on a profit on its digital platform on an annual basis. (Id. at 11-12).

Prior to around 2019, Nview referred customers to Dr. Sheehan "for licensing or permissions to use the paper or PDF versions of [his] M.I.N.I. or rating scales." (Id. at 10). In March 2020, a third party approached Nview about licensing the technology in paper format. (Id. at 12). Dr. Young wrote to Mr. Szyperski, "This is an example where we loose [sic] the agreement because it is the paper version." (Id.). Another potential customer also approached Nview about licensing the technology in paper format in March 2020. (Id.). Dr. Young forwarded the request to Mr. Szyperski and wrote, "Here is where the rubber meets the road. Do we send this to Sheehan or speak by and sell the paper?" (Id.). In depositions, neither Dr. Young nor Mr. Szyperski clarified what Dr. Young meant by "speak by." (Doc. ## 124-10 at 402:24-403:25; 124-11 at 196:21-197:14).

Nview sold paper versions of the technology covered by the License Agreement to approximately five companies. (Doc. # 124-15 at 40:13-22, 47:11-48:13). Nview did not tell Dr. Sheehan that it had begun selling paper versions of the technology. (Doc. # 124-4 at ¶ 14).

On June 30, 2022, a representative of AbbVie, a potential customer of Nview, emailed Nview stating that "after speaking with the copyright owner of the instrument we have been informed the MINI is only allowed to be administered by paper." (Doc. # 121-20). Mr. Szyperski confirmed that Nview stopped selling paper versions of the technology in early 2022. (Doc. # 121-11 at 108:19–22; 76:20–77:12; 197:6–12). He acknowledged that the reason Nview stopped selling paper versions was "related to the[se] legal proceedings." (Id. at 77:8–10).

### B. **False Advertising**

Nview published a press release in September 2019 stating that the MINI had been "endorsed by the National Institutes of Health and World Health Organization." (Doc. # 124-12 at 70). The MINI has never been endorsed by the NIH or the WHO. (Doc. # 124-5 at 24–25). Nview also claimed that the MINI had been "certified by the FDA and the WHO." (Doc. # 214-17 at 108). The MINI has never been certified by the FDA or the WHO, which do not certify diagnostic instruments like the MINI. (Doc. # 124-5 at 24–25; Doc. # 124-18 at 97:3–16). In a December 9, 2019 email, Mr. Szyperski stated that "the MINI . . . is approved by the FDA." (Doc. # 124-11 at 153).

Mr. Szyperski admitted that this claim was incorrect: the MINI was not approved by the FDA. (Id. at 42:9-43:19).

Dr. Sheehan and his colleague Jennifer Giddens both registered their concerns about the certification claims on Nview's website. (Doc. # 124-3 at 292:22-293:11; Doc. # 124-11 at 156). Ms. Giddens stated that Nview's website contained other misleading information. (Doc. # 121 at 9). Other than Dr. Sheehan and Ms. Giddens, Dr. Sheehan has not identified anyone else who was confused or misled by the website. (Id. at 9-10).

Nview has also claimed that its version of the MINI is "validated" in marketing materials. (Doc. # 124-11 at 70).

Finally, Nview has claimed that it had "ownership of Dr. Sheehan's intellectual property rights." (Doc. ## 47-8; 124-6 at 74:4-78:4).

Dr. Sheehan alleges that his reputation has been harmed by Nview's purportedly false advertising. (Doc. # 47 at 66). He stated that "this is international staggering damage to my reputation. (Doc. # 124-3 at 299:5-6). When asked what basis he had for claiming that his reputation was harmed, he stated, "there -- I mean, there is fantastic amount of -- I mean, false advertising has ramifications all over the place, I mean." (Id. at 298:23-24). One of his expert witnesses,

Benjamin B. Brodey, testified that "if somebody used the MINI and ended up getting results that were not correct," those incorrect "results would principally damage [Dr. Sheehan]." (Doc. # 124-18 at 98:20-22). Northwell Health's corporate representative, who testified regarding Northwell's experience with Nview's version of the MINI, explained that Northwell experienced technical problems while using the MINI and stated that his "assumption" was that Nview's version of the MINI was based on "the paper MINI that Dr. Sheehan had created[.]" (Doc. # 127-10 at 51:7-53:5, 63:25-14, 67:15-25).

C. **Procedural History**

Nview initiated this action against Dr. Sheehan on February 18, 2021, alleging breach of the License Agreement and Amendment (Count I), breach of the Consulting Agreement (Count II), breach of the implied covenant of good faith (Count III), defamation (Count IV), tortious interference with contract (Count V), tortious interference with prospective economic advantage (Count VI), deceptive and unfair trade practices (Counts VII and VIII), and unfair competition (Count IX). (Doc. # 45 at 13-21). Nview also requests injunctive relief, asking the Court to prohibit Dr. Sheehan from making "false and misleading statements to Nview's customers, potential customers, business partners,

and vendors" (Count X). (Id. at 21). Finally, Nview requests declaratory relief that Nview has "received a license to the Sheehan Technology without exception" (Count XI) and that "there is no default of the License Agreement by Nview" (Count XII). (Id. at 21-23).

Dr. Sheehan counterclaimed, alleging breach of the License Agreement (Count 1), false advertising in violation of the Lanham Act (Count 2), promissory estoppel (Count 3), and unjust enrichment (Count 4). (Doc. # 47 at 60-74).

The parties now both seek entry of summary judgment in their favor. (Doc. ## 121, 124). Nview seeks summary judgment on its claim for declaratory relief and on Dr. Sheehan's counterclaims for breach of contract, false advertising, promissory estoppel, and unjust enrichment. (Doc. # 121 at 1). Nview also sought summary judgment on its claims for breach of implied covenant of good faith, defamation, tortious interference with prospective economic advantage, and injunctive relief. (Id.). However, in its reply, Nview noted that it was withdrawing its motion for summary judgment as to its claims for breach of implied covenant, defamation, tortious interference, and injunctive relief. (Doc. # 129 at 3). As such, those issues are not discussed in this Order.

Dr. Sheehan seeks summary judgment as to (1) whether Dr. Sheehan has exclusive ownership of and rights to paper and PDF versions of his intellectual property, and Nview infringed on those rights; (2) whether Nview seeks damages that are contractually barred; and (3) whether Nview made certain literally false commercial representations, establishing the falsity element of his Lanham Act claim. (Doc. # 124 at 1).

Each party has responded (Doc. ## 127, 128) and replied. (Doc. ## 129, 130). The Motions for Summary Judgment are now ripe for review.

### D. **The Expert Testimony**

Additionally, Nview filed a Daubert motion to exclude the expert report and testimony of one of Dr. Sheehan's expert witnesses, Maura Norden. (Doc. # 122). Dr. Sheehan filed a Daubert motion to limit the testimony of Nview's experts, Grace Powers and Jon D. Elhai, Ph.D. (Doc. # 123).

Dr. Sheehan offers the testimony of Maura Norden as to whether Nview's software is subject to the Federal Food, Drug, and Cosmetic Act and whether Nview complied with applicable FDA regulatory requirements. (Doc. # 122-1 at 3). Ms. Norden is an "FDA regulatory affairs consultant with expertise in matters concerning FDA regulation of devices with a

13

particular focus on FDA regulation of digital health technologies." (Id.). She spent fifteen years "advising a variety of clients first as a lawyer and then as a consultant about FDA regulation of devices and digital health." (Id.). In her report, Ms. Norden reached the following conclusions:

> (1) It is "reasonable to question whether the Nview software is subject to FDA jurisdiction and whether it complies with any applicable FDA regulatory requirements."
> (2) Nview's "failure to have high-quality internal documentation explaining its rationale for determining that its software is outside FDA jurisdiction prior to going to market [is] inconsistent with industry best practices."

(Id. at 3-4).

Ms. Norden stated that she was "unable to reach a firm conclusion about whether the FDA has statutory jurisdiction to regulate the software and whether it is subject to the FDA's regulatory requirements as a device" because she was not able to "examine the Nview software as it existed before the dispute[.]" (Id. at 10). But she believed the software was "very likely" subject to FDA regulation. (Doc. # 122-2 at 35:10-24).

Nview offers the testimony of Ms. Powers and Dr. Elhai as rebuttal witnesses. Ms. Powers was retained to opine on whether Nview's software was subject to FDA regulation. (Doc. # 123-7 at 2). Ms. Powers is an "independent regulatory

affairs consultant" with "twenty years of industry experience in medical devices and mid-size medical device companies." (Id.). Dr. Elhai was retained to rebut opinions by two of Dr. Sheehan's other expert witnesses, Mr. Brodey and Michael B. First, regarding whether Nview's software was validated. (Doc. # 124-19 at 189). Dr. Elhai holds a Ph.D. in clinical psychology and has "empirically examined psychological assessment, psychometric and diagnostic research questions in [his] published scientific research for approximately 25 years." (Id. at 190).

Both Ms. Powers and Dr. Elhai criticize Dr. Sheehan's experts for failing to test Nview's software for themselves. (Doc. ## 123-7 at 10; 124-19 at 192). In relevant part, Ms. Powers reached the following conclusion in her report:

> (1)   "The MINI is not considered a medical device" regulated by the FDA pursuant to the "FDA guidance provided in the 'Clinical Decision Support Software Draft Guidance for Industry and Food and Drug Administration Staff – Document issued on September 27, 2019.'"

(Doc. # 123-7 at 2). Ms. Powers also states that the MINI is "conducted online via a secure and HIPAA compliant portal[.]" (Id. at 18).

Both parties have responded to the Daubert Motions. (Doc. ## 125, 126). The Motions are now ripe for review.

15

## II.  **Legal Standard**

### A. **Daubert Motion**

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Implementing Rule 702, _Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S. 579 (1993), requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable. _See_ _Id._ at 589–90. The _Daubert_ analysis also applies to non-scientific expert testimony. _Kumho Tire Co. v. Carmichael_, 526 U.S. 137, 147 (1999). District courts must conduct this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" _Rink v. Cheminova, Inc._, 400 F.3d 1286, 1291 (11th Cir. 2005). The Eleventh Circuit "requires trial courts acting as gatekeepers to engage in a 'rigorous three-part

inquiry.'" Hendrix v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010).

> The district court must assess whether:
>
> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of these requirements. Id.

## B. **Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742

(11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine

18

issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

## III. **Analysis**

The Court will address Nview's Daubert Motion first, followed by Dr. Sheehan's Daubert Motion, Nview's Motion for

Summary Judgment, and finally Dr. Sheehan's Motion for Summary Judgment.

## A. **Nview's Daubert Motion**

Nview seeks to exclude the expert testimony of Ms. Norden on the grounds that it fails to meet the reliability or helpfulness requirements of Rule 702. (Doc. # 122 at 5). Nview also argues that Ms. Norden's testimony is irrelevant under Rule 402. (<u>Id.</u>).

### 1. **Relevance and Helpfulness**

Again, to be admissible, expert testimony must assist the trier of fact. Fed. R. Evid. 702. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." <u>United States v. Frazier</u>, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation omitted). "[T]he court must 'ensure that the proposed expert testimony is "relevant to the task at hand," . . . i.e., that it logically advances a material aspect of the proposing party's case.'" <u>Allison v. McGhan</u>, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted).

So, while "[t]he 'basic standard of relevance . . . is a liberal one,' <u>Daubert</u>, 509 U.S. at 587, . . .[,] if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because

there is no 'fit.'" Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009) (citations omitted). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63 (citation omitted).

Nview argues that Ms. Norden's testimony will not be helpful to a trier of fact because she "is unable to opine on whether Nview's software is a device subject to any FDA regulations." (Doc. # 122 at 8). Because her report does not reach a firm conclusion regarding whether the MINI is a device, Nview contends that Ms. Norden's testimony does not rest on a reliable foundation and is irrelevant. (Id.).

Dr. Sheehan argues that Ms. Norden's testimony should not be excluded as irrelevant. He states that her testimony is relevant because it will be used to rebut Nview's assertion that Dr. Sheehan acted in bad faith by questioning whether Nview's software was FDA compliant and to support Dr. Sheehan's allegation that Nview breached the License Agreement in part based on its irresponsible approach to FDA compliance. (Doc. # 125 at 2). He states that Ms. Norden will testify that the software was "very likely" subject to FDA regulation. (Id. at 4) (quoting (Doc. # 122-2 at 35:10-24)).

21

Dr. Sheehan states Ms. Norden will testify that "Nview cannot establish that clinicians had enough of the information specified by FDA to independently evaluate the basis of a recommendation or rule out that clinicians may rely primarily upon the software to make a diagnosis[.]" (Id. at 15; Doc. # 122-1 at 10). He also states she will testify that "Nview acted irresponsibly in failing to prepare a credible regulatory assessment before marketing its software to treat individuals with serious mental health conditions." (Doc. # 125 at 16; Doc. # 122-1 at 10-11).

Ms. Norden's testimony is relevant and satisfies the requirement that it be helpful to the trier of fact. Ms. Norden's expertise will allow her to explain the nuances of the FDA's regulation of medical devices and help the trier of fact understand if Dr. Sheehan's alleged concerns about FDA-compliance were legitimate. Whether his concerns were legitimate is relevant to whether the initial notice of default he sent to Nview was sent in bad faith — an issue on which Nview seeks declaratory judgment.

### 2.   **Reliability**

The Court must also assess whether the expert's methodology is reliable. "Exactly how reliability is evaluated may vary from case to case, but what remains

constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). There are four recognized, yet non-exhaustive, factors a district court may consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

Seamon v. Remington Arms Co., 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. Id. (citations omitted).

"If the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation and internal quotation marks omitted). The Court's analysis as to reliability "focus[es] 'solely on principles and methodology,

23

not on the conclusions that they generate.'" <u>Seamon</u>, 813 F.3d at 988 (citation omitted).

Nview contends that Ms. Norden's report is unreliable because it is not based on sufficient facts or data. (Doc. # 122 at 8). Ms. Norden states that she was not able to review the Nview software "as it existed before the dispute to determine whether it is transparent in disclosing the bases for its recommendations," and, therefore, she was "unable to reach a firm conclusion about whether FDA has statutory jurisdiction to regulate the software and whether it is subject to FDA's regulatory requirements as a device." (<u>Id.</u> at 9). Nview argues that Ms. Norden's inability to reach a conclusion is due to a "lack of due diligence." (<u>Id.</u>). Nview states that Ms. Norden never reviewed any version of the software, despite the fact that the changes made to the software did not impact "what a health care professional using the software can independently review regarding the basis for the software's recommendations." (<u>Id.</u>).

Dr. Sheehan responds that Ms. Norden's testimony is based on the same "essential framework" as Nview's expert's testimony. (Doc. # 125 at 6). He also argues that her testimony is reliable because she relied on (1) her experience, (2) the deposition testimony of nonparties who

discussed the "clinical users of Nview's software who had struggled to make sense of its algorithms," (Id. at 14), and (3) "Nview's own experts who admit they lacked information or time to evaluate the algorithms." (Id. at 18-19).

Ms. Norden's testimony is reliable. Ms. Norden used her fifteen years of experience as an FDA regulatory consultant and record evidence to determine that Dr. Sheehan's concerns were reasonable and that the software was "very likely" subject to FDA compliance. Any alleged flaws in Ms. Norden's methodology should be addressed during cross examination. See Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." (citations and internal quotation marks omitted)).

Nview's Daubert Motion is denied.

## B. **Dr. Sheehan's Daubert Motion**

Dr. Sheehan seeks to limit Nview's experts' testimony in three respects. First, he seeks to exclude Ms. Powers' testimony that "Nview's software performs the same as Dr. Sheehan's underlying . . . instruments" on the grounds Ms. Powers in unqualified and her method is unreliable. (Doc. # 123 at 1). Second, he seeks to prevent Ms. Powers and Dr.

Elhai from "criticiz[ing] the defense experts for not having inspected Nview's software." (Id. at 2). Finally, Dr. Sheehan seeks "to limit Ms. Powers' testimony to the extent it rests on untested 'facts' from Nview manager James Szyperski[.]" (Id. at 3). The Court addresses each of Dr. Sheehan's arguments in turn.

### 1. **Ms. Powers' FDA Device Testimony**

The first question under Daubert is whether Ms. Powers is qualified to testify competently regarding the matters she intends to address. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 563 (11th Cir. 1998). An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" Clena Invs., Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting Jack v. Glaxo Wellcome, Inc., 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002)).

"This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Id. (citations and internal quotation marks

26

omitted). The Court is mindful that its "gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz, 253 F.3d at 666 (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)).

Dr. Sheehan argues that Ms. Powers is "not a clinical expert" and is, therefore, not qualified to determine whether "Nview's software is identical to the paper version of the MINI[.]" (Doc. # 123 at 10). In its response, Nview notes that Ms. Powers is a "highly qualified and accomplished regulatory affairs consultant who has more than twenty years of industry experience concerning medical devices, including research and development." (Doc. # 126 at 7). It also contends that Ms. Powers does not need to be a clinical expert "to determine whether Nview's software program provides a clinician the ability to independently review the basis for the software's recommendations." (Id.).

The Court agrees with Nview that Ms. Powers is qualified to state that Nview's and Dr. Sheehan's versions of the MINI are the same. Dr. Sheehan does not explain why Ms. Powers would need to be a "clinical expert" to examine both versions of the MINI and determine whether they are identical. Ms. Powers is a biomedical engineer and regulatory affairs consultant for medical devices and products, and is minimally

qualified to opine that the two versions are the same. Dr. Sheehan's Daubert Motion is denied as to Ms. Powers' qualifications.

The next question is whether Ms. Powers' testimony is reliable. Dr. Sheehan states that Ms. Powers' testimony that the two versions of the MINI are the same is unreliable because Ms. Powers "did not examine Nview's software algorithm or any information about its design or actual or intended uses." (Doc. # 123 at 10). He also argues that Nview "withheld an extensive record of the clinical errors in its software algorithms." (Id. at 7). Dr. Sheehan contends that Ms. Powers might have reached a different conclusion as to whether the MINI is a device subject to FDA regulation if she had thoroughly examined Nview's algorithm and known about the software errors. (Id. at 11).

Nview responds that Ms. Powers was "given a demonstration of the software by Nview," "observed the structured interview assessment questions and the resulting clinician summary report generated by Nview's software to assist the clinician with a potential diagnosis," and simulated how a clinician would administer the MINI to a patient and interpret recommendations. (Doc. # 126 at 5-6; Doc. # 123-7 at 2, 8). Nview also argues that Ms. Powers'

statement that the two versions are identical is irrelevant to her ultimate determination that the MINI is not a device subject to FDA regulation. (Doc. # 126 at 4-5).

The Court disagrees with Dr. Sheehan. Ms. Powers' opinion is based on her twenty years of experience in the medical device field and her observation and personal use of Nview's software and her comparison between the digital and paper versions of the MINI. Reliance on experience combined with relevant evidence is sufficient to establish reliability. See Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1336 (11th Cir. 2010) ("[T]here are instances in which a district court may determine the reliability prong under Daubert based primarily upon an expert's experience and general knowledge in the field[.]"). Any alleged flaws in Ms. Powers' methodology should be addressed during cross examination. Dr. Sheehan's Daubert Motion is denied as to Ms. Powers' reliability.

### 2. **Ms. Powers' and Dr. Elhai's Criticism of Defendant's Experts**

Dr. Sheehan seeks to prevent Ms. Powers and Dr. Elhai from criticizing his experts for not inspecting Nview's software. In their rebuttal reports, both Ms. Powers and Dr. Elhai criticize Dr. Sheehan's experts for failing to review

Nview's software as part of their evaluations. (Doc. # 123-7 at 10; Doc. # 124-19 at 196-98). Dr. Sheehan argues that Nview failed to preserve "a prelitigation version of Nview's software." (Doc. # 123 at 13). Because Nview failed to preserve a prelitigation version of the software, Dr. Sheehan's experts were unable to "access the same software that Ms. Powers used for her mock interview and considered important to her analysis." (Id.) (citing (Doc. # 123-6 at 66:7-67:20)). Dr. Sheehan contends that the failure to preserve a prelitigation version of the software was inexcusable in light of the "preservation notice requesting immediate action to preserve relevant evidence, including electronically stored information" he sent to Nview on January 11, 2021 – the same month Ms. Powers was conducting her first inspection of the software. (Id. at n.6).

Nview counters that Dr. Sheehan's experts never reviewed *any* version of the software, despite the fact that "the only changes made to the software are based on changes that were made by Dr. Sheehan in the paper version of the same technology[.]" (Doc. # 126 at 8). Nview, on the basis of an affidavit from Dr. Young, claims that "nothing has changed regarding what a health care professional using the software can independently review regarding the basis for the

software's recommendations." (Id.). Nview contends that "despite having prior access to the software and knowing for several months that the 'pre-litigation' software . . . was not available for inspection now, Dr. Sheehan did nothing because that benefitted his position." (Id.).

The Court will not limit Ms. Powers' and Dr. Elhai's testimony criticizing Dr. Sheehan's experts for not reviewing the software. Dr. Sheehan is free to explain at trial that his experts did not have a chance to review the software as it existed in and prior to January 2021; however, Nview's rebuttal experts should be able to explain the potential flaws in the methodology of Dr. Sheehan's experts. The experts' decision not to review any version of the software reasonably may affect the weight a jury gives to that expert testimony.

Dr. Sheehan's Daubert Motion is denied as to the request to limit Nview's experts' criticism of defendant's experts' failure to review the software.

### 3. Ms. Powers' Potential HIPAA Testimony

Dr. Sheehan seeks to prevent Ms. Powers from testifying that Nview's software is HIPAA-compliant. In her original assessment of Nview's software, performed in January 2021 prior to the start of this litigation, Ms. Powers wrote that Nview's version of the MINI "is conducted online via a secure

31

and HIPAA compliant portal[.]" (Doc. # 123-7 at 18). Ms. Powers has "very little background on HIPAA" and her only basis for writing that the software was HIPAA compliant was a statement by Mr. Szyperski. (Doc. # 123 at 15; Doc. # 123-6 at 18:14-15; 56:14-16). In its response, Nview states that Ms. Powers is not a HIPAA compliance expert and that she "will not render any opinions in this matter concerning HIPAA compliance." (Doc. # 126 at 10).

Dr. Sheehan's <u>Daubert</u> Motion is denied without prejudice as to the request to prevent Ms. Powers from testifying that Nview's software is HIPAA-compliant. The Court may revisit this issue if Nview seeks to admit such testimony during trial.

## C. **Nview's Motion for Summary Judgment**

### 1. **Nview Count XI – Declaratory Relief**

Nview seeks a declaration that, under the February Agreement and the April Amendment, "it has licensed the right to sell paper" and that "Dr. Sheehan only has the nonexclusive right to sell paper (not .pdf), and does not have the right to dictate Nview's use, distribution or other licensed rights that Nview has pursuant to the February License and [April] Amendment." (Doc. # 121 at 12). It contends that its claim for declaratory relief can be resolved as a matter of law.

32

According to Nview, the terms of the February Agreement and April Amendment are not ambiguous, and their plain meaning supports Nview's contention that Dr. Sheehan has a nonexclusive right to sell paper but not PDF versions.

Dr. Sheehan responds that the August Agreement "expressly 'superseded'" the February Agreement. (Doc. # 127 at 9). The August Agreement, he argues, confirms that Dr. Sheehan has "exclusive copyrights, ownership of and all rights to the [technology] in paper and in PDF forms." (Id. at 8) (internal quotation marks omitted).

In a diversity action, the Court must apply "the substantive law of the forum state." Tech. Coating Applicators, Inc. v. U.S. Fid. & Guar. Co., 157 F.3d 843, 844 (11th Cir. 1998). Here, Florida's choice of law rules govern. As stated by the Eleventh Circuit, "the Florida Supreme Court has unambiguously indicated its intent . . . to adhere to the traditional rule of lex loci contractus." Bailey v. Netherlands Ins. Co., 615 F. Supp. 2d 1332, 1336 (M.D. Fla. 2009).

"Under Florida's choice-of-law rules, it is well-settled that Florida courts are obligated to enforce choice-of-law provisions unless a showing is made that the law of the chosen forum contravenes strong public policy or that the clause is

33

otherwise unreasonable or unjust." Arndt v. Twenty-One
Eighty-five, LLC, 448 F. Supp. 3d 1310, 1315 (S.D. Fla. 2020)
(citing Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.,
761 So. 2d 306, 314 (Fla. 2000)). The February and August
Agreements each contain the same provision specifying that
the governing law is that of Delaware. (Doc. # 121-2 at 8;
Doc. # 121-9 at 9) ("The laws of the State of Delaware will
govern this Agreement without reference to Delaware's choice
of law provisions.").

In Delaware, the construction of contract language
presents a question of law. Rhone-Poulenc Basic Chems. Co. v.
Am. Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992). A
court's "task is to fulfill the parties' shared expectations
at the time they contracted." Leaf Invenergy Co. v. Invenergy
Renewables LLC, 210 A.3d 688, 696 (Del. 2019) (internal
quotations omitted). To determine what contractual parties
intended, Delaware courts start with the text. Sunline Com.
Carriers, Inc. v. CITGO Petroleum Corp., 206 A.3d 836, 846
(Del. 2019). When the contract is clear and unambiguous,
courts should give effect to the plain meaning of the
contract's terms and provisions, without considering
extrinsic evidence. Osborn v. Kemp, 991 A.2d 1153, 1159-60
(Del. 2010). To aid in the interpretation of the contract's

meaning, "Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." Sunline, 206 A.3d at 846. "The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term mere surplusage." Id. General terms of the contract must yield to more specific terms. Id.

Delaware enforces integration clauses. See FdG Logistics LLC v. A&R Logistics Holdings, Inc., 131 A.3d 842, 858 (Del. Ch. 2016) ("Delaware law enforces clauses which identify the specific information on which a party has relied and foreclose reliance on other information."), aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC, 148 A.3d 1171 (Del. 2016). "Under blackletter law, a binding and completely integrated agreement 'discharges prior agreements to the extent that they are within its scope.'" Focus Fin. Partners, LLC v. Holsopple, 241 A.3d 784, 822 (Del. Ch. 2020) (quoting Restatement (Second) of Contracts § 213 (1981)).

First, the Court must determine whether the February Agreement is the operative License Agreement. Here, the April Amendment, together with the February Agreement it amends, is a fully integrated agreement that supersedes the August

35

Agreement. The parties quibble over whether the August Agreement was fully executed. However, regardless of whether the August Agreement was fully executed, the April Amendment supersedes it and reinstates the February Agreement as the operative License Agreement.

The relevant language in the April Amendment is clear and unambiguous. The April Amendment states that it amends the "License Agreement ('the Agreement') dated as of February 15, 2016" and that it "together with the Agreement, as amended . . . represent the entire agreement of the parties with respect to the subject matter herein." (Doc. # 121-6 at 2-3). All three documents deal with the same subject matter: the licensing rights to Dr. Sheehan's technology. The April Amendment specifically references the February Agreement as the document it amends, and it makes no reference to the August Agreement. Therefore, the August Agreement is no longer operative and is not relevant to determining the rights of the parties. See Focus Financial Partners, 241 A.3d at 823 ("When a prior agreement and a subsequent agreement cover the same subject matter and the subsequent agreement contains an integration clause, the prior agreement needs to be memorialized in the subsequent agreement to survive." (internal quotation omitted)).

Turning to the language of the February Agreement as amended by the April Amendment, the License Agreement gives Nview the right to sell the technology in any format, including paper and PDF. The April Amendment states that "Dr. Sheehan hereby grants to Nview . . . a[n] exclusive license, with the right to . . . make, have made, sell, [or] offer to sell . . . products utilizing the Sheehan Technology in the Field." (Doc. # 121-6 at 2). The April Amendment defines "Field" as "all fields of use, *in any format*, including behavioral healthcare, healthcare technology and commercial research applications." (Id.)(emphasis added). The February Agreement also states that "Dr. Sheehan shall retain the right to continue to use and bill for the use of the Sheehan Technology in paper format." (Doc. # 121-2 at 4). The plain language of the License Agreement provides that Nview has a license to sell the Technology in any format, which would include paper and PDF versions, and that Dr. Sheehan retains a nonexclusive right to sell the Technology in paper format.

Because the plain language of the License Agreement supports its request, Nview's Motion for Summary Judgment is granted as to Count XI.

## 2. **Dr. Sheehan's Breach of Express and Implied Contractual Duties Counterclaim**

Dr. Sheehan's first counterclaim is not a model of clarity. He asserts that Nview breached the License Agreement by materially defaulting in various ways. (Doc. # 47 at 60-61). In the same counterclaim, he also asserts that Nview is subject to an implied duty to refrain from "commercially unreasonable acts that threaten Dr. Sheehan's interests in his intellectual property." (Id. at 60). He states that Nview had a "duty to act with honesty and integrity" when selling his Technology. (Id. at 61). As relief for these breaches of express and implied duties, Dr. Sheehan seeks a declaratory judgment "that Nview's persistent failures to engage with Dr. Sheehan, heed his concerns, or exercise reasonable care in the use of his intellectual property constitute uncured material defaults under the license." (Id. at 64). Alternatively, he requests that the Court "enjoin[] Nview, under judicial supervision and independent expert supervision, to develop and execute a corrective action plan, with the aim for Nview to investigate and cure the foregoing areas of concern within a reasonable time period." (Id.).

Nview argues that Dr. Sheehan has failed to establish this claim because, Nview contends, the claim is based on the

February Agreement, which Dr. Sheehan has allegedly stated is not a valid agreement. (Doc. # 121 at 17-18). Additionally, Nview states that Dr. Sheehan is not entitled to a declaration of rights because it is improper to assert a claim for breach of contract and declaratory judgment in the same cause of action. (Id. at 18) (citing Intermec IP Corp. v. TransCore, LP, 2021 WL 4841131, at *2 (Del. Super. Oct. 18, 2021)). Nview also argues that Dr. Sheehan cannot prove that Nview breached any implied covenants. (Id. at 19). Finally, Nview contends that injunctive relief is not available to Dr. Sheehan because money damages would be an adequate remedy.

Dr. Sheehan responds that he is seeking a declaration that Nview "materially breached its express and implied duties." (Doc. # 121 at 23). He also argues that Nview has violated express duties that arise under identical provisions in the February and August Agreements. (Id. at 22). Dr. Sheehan contends that Nview has "frustrated the parties' bargain" to the point that it has breached its implied duties to him. (Id. at 23). Finally, he contends that he can obtain injunctive relief because it "could be appropriate if, for example, the Court concludes that by failing to develop Dr. Sheehan's IP in a responsible manner, Nview may have endangered patient safety[.]" (Id. at 24).

39

The Court construes Dr. Sheehan's counterclaim as a legal claim for breach of contract and breach of the implied duty of good faith and fair dealing. Because Dr. Sheehan's first counterclaim alleges two separate legal violations, the Court will address each in turn.

### a. **Dr. Sheehan's Breach of Contract Claim**

As the Court as already determined that the February Agreement and April Amendment make up the operative License Agreement, it will not grant summary judgment for Nview on this counterclaim based on the idea that Dr. Sheehan has tried to argue that the February Agreement is not valid. Dr. Sheehan's counterclaim is based on a valid agreement, which he attached to his pleading. (Doc. # 47 at 60; Doc. # 47-2). A later statement by Dr. Sheehan during his deposition that he believed the February Agreement was "negated" by the August Agreement does not change the fact that his breach of contract counterclaim was at least alternatively based on the February Agreement. Nview has shown no legal basis for its contention otherwise.

The Court now turns to Dr. Sheehan's request for declaratory relief. Here, because declaratory relief presents a procedural issue, the Court construes Dr. Sheehan's request for declaratory relief as arising under the federal

Declaratory Judgment Act. See Melton v. Century Arms, Inc., 243 F. Supp. 3d 1290, 1307-08 (S.D. Fla. 2017) (finding that declaratory relief is a procedural issue and construing plaintiff's claims for declaratory and injunctive relief under the federal Declaratory Judgment Act). The Declaratory Judgment Act governs procedural rights. See Manuel v. Convergys Corp., 430 F.3d 1132, 1138 (11th Cir. 2005) ("There is little doubt . . . that the district court had to apply the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., rather than the state declaratory judgment act, in this action."); GTE Directories Publ'g Corp. v. Trimen Am., Inc., 67 F.3d 1563, 1567 (11th Cir. 1995) (noting that the Act "does not enlarge the jurisdiction of the federal courts but rather is operative only in respect to controversies which are such in the constitutional sense. . . . Thus the operation of the [Act] is procedural only.").

The Declaratory Judgment Act "permits actual controversies to be settled before they ripen into violations of law or a breach of contractual duty." Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC, 650 F. Supp. 2d 1213, 1230 (S.D. Fla. 2009) (citing 10B C. Wright & A. Miller, Federal Practice & Procedure, Civil 3d § 2751 (2004)). "Generally, the Act allows prospective defendants to sue to

establish non-liability, or affords a party threatened with liability an opportunity for adjudication before its adversary commences litigation." Id. at 1308. Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls. Co., 515 U.S. 277, 286 (1995). "In exercising discretion as to a claim for declaratory relief, courts often consider whether a declaratory judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and whether it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." See Goodbys Creek, LLC v. Arch Ins. Co., No. 3:07-cv-947-PAM-JBT, 2009 WL 10671130, at *4 (M.D. Fla. Aug. 11, 2009) (quoting 10B Charles Alan Wright et al., Federal Practice & Procedure § 2759 (3d ed. 1998)) (internal quotation marks omitted).

Dr. Sheehan requests a declaration that "Nview's persistent failures to engage with Dr. Sheehan, heed his concerns, or exercise reasonable care in the use of his intellectual property constitute uncured material defaults under the license, thereby triggering Dr. Sheehan's full remedies under the license." (Doc. # 47 at 64). He does not assert a separate claim for breach of contract. He alleges

that Nview breached the License Agreement by failing to consult with him and by making false and misleading claims about his technology (Id. at 61-63), then he requests declaratory and injunctive relief to rectify those breaches. (Id. at 64). Therefore, the Court does not agree with Nview that Dr. Sheehan's request for declaratory relief is duplicative of a separate breach of contract claim.

However, Dr. Sheehan has not properly pled a claim for declaratory relief. He has alleged breach of contract, a legal claim, and requested injunctive relief, a remedy that is not available in a declaratory judgment claim. Dr. Sheehan does not ask the Court for a "legal ruling, such as a request to resolve differences in the interpretation of specific language in an agreement." Sierra Equity Group, 650 F. Supp. 2d at 1231. Instead, he focuses only on alleged past breaches of the License Agreement (failing to consult and making false and misleading claims), the adjudication of which requires the Court to make various factual determinations with respect to the past conduct of the parties. See Id. ("[Q]uestions regarding whether torts have been committed or a contract was adequately performed is unrelated to the purpose behind the Declaratory Judgment Act."); Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC, 783 F. Supp. 2d 1214, 1216 (S.D. Fla. 2011)

(finding that declaratory relief is inappropriate where it requires the court to make factual determinations regarding past conduct). "[T]he purpose of the Declaratory Judgment Act is to clarify the legal relations at issue and to settle controversies prior to a legal breach of duty or contract." Id.

Because Dr. Sheehan's first counterclaim inappropriately seeks declaratory relief, the Court grants Nview's Motion for Summary Judgment as to this issue.

The Court, however, will not grant summary judgment on Dr. Sheehan's breach of contract claim and request for injunctive relief. There is a genuine dispute of material fact as to whether Nview violated the License Agreement. Dr. Sheehan alleges that Nview failed to consult with him on press releases related to the License Agreement. (Doc. # 47 at 62). Dr. Sheehan provides evidence of press releases that Nview issued without consulting with him relating to the License Agreement. (Doc. # 124-12 at 70; Doc. # 124-3 at 292:22-293:11). Nview does offer any facts to dispute Dr. Sheehan's assertion. Because there is a genuine dispute of material fact as to whether Nview breached the License Agreement, the Court denies summary judgment as to Dr. Sheehan's express breach of contract claim and request for injunctive relief.

### b. <u>Dr. Sheehan's Breach of Implied Duties Claim</u>

"[T]he implied covenant of good faith and fair dealing should not be applied to give plaintiffs contractual protections that "they failed to secure for themselves at the bargaining table." <u>Winshall v. Viacom Int'l, Inc.</u>, 55 A.3d 629, 636-37 (Del. Ch. 2011), <u>aff'd</u>, 76 A.3d 808 (Del. 2013). "[T]he implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal." <u>Id.</u> at 637.

The implied covenant tries to "honor the reasonable expectations created by autonomous expressions of the contracting parties." <u>Intermec</u>, 2021 WL 3620435, at *12 (Del. Super. Ct. Aug. 16, 2021) (quoting <u>E.I. du Pont de Nemours & Co. v. Pressman</u>, 679 A.2d 436, 443 (Del. 1996)). It "thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." <u>Id.</u> "Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully." <u>Kuroda v. SPJS Holdings, L.L.C.</u>, 971 A.2d 872, 888 (Del. Ch. 2009).

In reviewing the February Agreement and April Amendment, the Court cannot find evidence that the parties meant to create a duty for Nview "to act with honesty and integrity" when selling Dr. Sheehan's technology. Dr. Sheehan identifies no gaps in the License Agreement that require filling, and he cites no cases discussing any such duty. The expectation that Nview act with honesty when selling Dr. Sheehan's technology is not "so fundamental" to the agreement that the Court should read it into the contract as an implied duty. See Id. (dismissing breach of implied covenant claim where plaintiff failed to identify a specific implied obligation tied to the contract). Dr. Sheehan offers no authority demonstrating that Nview has breached an implied duty, and the Court's extensive independent research also revealed no such cases. Because Dr. Sheehan's breach of implied duties claim fails as a matter of law, the Court grants Nview's Motion for Summary Judgment on this portion of his first counterclaim.

### 3. **Dr. Sheehan's False Advertising Counterclaim**

Nview seeks summary judgment on Dr. Sheehan's second counterclaim, false advertising in violation of the Lanham Act. (Doc. # 47 at 64-67). It argues that Dr. Sheehan cannot prove that Nview's advertisements were deceptively false or misleading or that the advertisements had any material effect

on consumers' purchasing decisions. (Doc. # 121 at 23). Nview also contends that Dr. Sheehan does not have standing under the Lanham Act to bring this claim because he has not established reputational injury and "cannot demonstrate the requisite proximate cause." (Id. at 25).

Dr. Sheehan argues in response that he has provided evidence of reputational injury and points to deposition testimony from Dr. Sheehan, Mr. Brodey, and Northwell Health's corporate representative, who testified regarding Northwell's experience with Nview's version of the MINI. (Doc. # 127 at 19). He also argues that Nview's statements were literally false and cites to his argument to that effect in his Motion for Summary Judgment. (Id. at 17-18).

To prevail on a false advertising claim, a plaintiff must establish that: (1) the advertisements were false or misleading; (2) they deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product affects interstate commerce; and (5) the plaintiff has been injured because of the false advertising. Intertape Polymer Corp. v. Inspired Techs., Inc., 725 F. Supp. 2d 1319, 1332 (M.D. Fla. 2010).

First, the Court addresses whether Dr. Sheehan has standing under the Lanham Act. "[A] statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129 (2014) (internal quotation marks omitted). To show that he is within the zone of interests in a suit for false advertising under the Lanham Act, Dr. Sheehan must demonstrate "an injury to a commercial interest in reputation or sales." Id. at 132. Dr. Sheehan must also demonstrate that Nview's allegedly false advertisements are the proximate cause of his commercial injury. Id. In other words, Dr. Sheehan "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." Id. at 133.

At the summary judgment stage, the plaintiff "must set forth by affidavit or other evidence specific facts" demonstrating reputational harm. Club Exploria, LLC v. Austin, No. 6:18-cv-576-JA-DCI, 2020 WL 6585802, at *9 (M.D. Fla. Nov. 10, 2020) (quoting Bischoff v. Osceola Cnty., 222 F.3d 874, 878 (11th Cir. 2000)), aff'd, No. 21-11556, 2022 WL

884317 (11th Cir. Mar. 25, 2022). "[A]t a minimum <u>Lexmark</u> <u>International, Inc.</u> requires that, at the summary judgment stage, a plaintiff must provide some evidence from which a reasonable juror could conclude that its injuries were proximately caused by the defendant." <u>Id.</u> (quoting <u>Snac Lite,</u> <u>LLC v. Nuts 'N More, LLC</u>, No. 2:14-cv-01695, 2016 WL 6778268, at *15 (N.D. Ala. Nov. 16, 2016)).

Dr. Sheehan has alleged reputational harm due to Nview's purportedly false advertising. (Doc. # 47 at 66). He points to his own deposition testimony, along with testimony from Mr. Brodey and Northwell's corporate representative to demonstrate that reputational injury. Dr. Sheehan's testimony is unavailing. In the section of the deposition he cites, the closest he comes to explaining his reputational harm is when he states that "this is international staggering damage to my reputation." (Doc. # 124-3 at 299:5-6). The following exchange is the most detailed discussion of his reputational harm:

> Q.   And I'm -- I -- I want to know what the amount of damages are that you're seeking at trial regarding your false advertising claim?
> A.   Well, as I said, I really haven't given that any thought.
> Q.   Do you know what the basis for your damages are?
> A.   Well, there -- there -- I mean, there is fantastic amount of -- I mean, false advertising has ramifications all over the place, I mean.

(Id. at 298:15-24). Dr. Sheehan's vague statements regarding reputational harm are not enough at this stage to demonstrate the requisite commercial injury required for standing.

The testimony from Mr. Brodey and Northwell's corporate representative similarly do not demonstrate reputational injury. Mr. Brodey stated that "if somebody used the MINI and ended up getting results that were not correct," those incorrect "results would principally damage [Dr. Sheehan]." (Doc. # 124-18 at 98:20-22) (emphasis added). A hypothetical statement does not amount to a showing of reputational injury. Finally, Dr. Sheehan points to testimony from Northwell's corporate representative, Dr. Delbert Robinson. Dr. Robinson explained that Northwell experienced technical problems while using the MINI and stated that his "assumption" was that Nview's version of the MINI was based on "the paper MINI that Dr. Sheehan had created[.]" (Doc. # 127-10 at 51:7-53:5, 63:25-14, 67:15-25). At no point did Mr. Robinson state that his opinion of Dr. Sheehan was impacted, positively or negatively, by Northwell's experience with Nview's version of the MINI. This testimony does not show that Dr. Sheehan suffered reputational damage.

In short, none of the record evidence cited by Dr. Sheehan demonstrates reputational harm, and he makes no effort to quantify his damages. Thus, Dr. Sheehan cannot go forward with his claims under the Lanham Act because he has not demonstrated that he suffered reputational harm or that the reputational harm was caused by Nview's false advertisements. Dr. Sheehan lacks standing under the Lanham Act. See Snac Lite, 2016 WL 6778268, at *13 ("In order to survive summary judgment, a plaintiff must provide substantial evidence not just that Plaintiff suffered damages, but that those damages were caused by Defendant's alleged false advertisement.").

### 4. **Dr. Sheehan's Promissory Estoppel Counterclaim**

Next, Nview seeks summary judgment on Dr. Sheehan's third counterclaim for promissory estoppel. (Doc. # 47 at 67-72). Nview argues that promissory estoppel is precluded when an existing contract governs the issue. (Doc. # 121 at 27-28). Nview argues that the License Agreement governs Dr. Sheehan's rights to sell paper and PDF versions of the software and that Dr. Young's promises do not change those rights. (Id.).

In contrast, Dr. Sheehan contends that he is seeking to enforce "distinct promises made to him after the license

documents were executed." (Doc. # 127 at 24). He claims that Nview promised him that he had an exclusive right to distribute paper and PDF versions of his technology. In a June 23, 2019, email, Dr. Young wrote to Dr. Sheehan that Nview "clearly recognizes that any 'new' scales, changes to old scales or interviews all remain your property and you have exclusive rights to the paper versions." (Doc. # 124-10 at 583). Dr. Young went on to state that "this is now in two places the licensing agreement we previously executed and this consulting agreement." (Id.). Dr. Sheehan argues that Dr. Young's June 2019 email was "designed to induce [him] to sign" the consulting and stock purchase agreements attached to the email. (Doc. # 124 at 24).

Delaware law governs Dr. Sheehan's promissory estoppel claim. See Doe v. Roe, No. 20-14456, 2022 WL 1447378, at *2 (11th Cir. May 9, 2022) (stating that, under Florida law, "[t]he lex loci contractus test applies to the promissory estoppel and unjust enrichment claims as well as the breach of contract claim").

Under Delaware law, a plaintiff alleging promissory estoppel must show that (1) a promise was made; (2) the promisor's reasonable expectation was to induce action or forbearance on the part of the promisee; (3) the promisee

reasonably relied on the promise and took action to his detriment; and (4) the promise is binding because enforcement is the only way to avoid injustice. Davis v. Town of S. Bethany Beach, No. S20C-06-018, 2022 WL 6646506, at *3 (Del. Super. Ct. Oct. 11, 2022) (citing Lord v. Souder, 748 A.2d 393, 399 (Del. 2000)). Promissory estoppel is a substitute for consideration where no contract or other means of enforcing the promise exists. Lord, 748 A.2d at 400. A "party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract." J.C. Trading Ltd. v. Wal-Mart Stores, Inc., 947 F. Supp. 2d 449, 457 (D. Del. 2013); see also Weiss v. Nw. Broad. Inc., 140 F. Supp. 2d 336, 344 (D. Del. 2001) ("Because the court has determined that the Financing Agreement is a valid contract, Weiss cannot recover under a theory of promissory estoppel."); IGA Techs., Inc. v. PharmAthene, Inc., 67 A.3d 330, 348 (Del. 2013) ("Promissory estoppel does not apply, however, where a fully integrated, enforceable contract governs the promise at issue.").

The License Agreement governs the parties' rights to distribute paper and PDF versions of Dr. Sheehan's technology. See (Doc. # 121-6 at 2) ("Dr. Sheehan hereby grants to Nview a[n] . . . exclusive license to . . .

53

distribute . . . products utilizing the Sheehan Technology in the Field."). The License Agreement allows Nview to distribute paper and PDF versions of Dr. Sheehan's technology. Dr. Sheehan argues that, because Dr. Young's email was sent after the April Amendment was executed, Dr. Young's promise is an independent promise from the License Agreement. However, Dr. Sheehan cites no authority for this proposition, and the Court has not independently found any authority allowing a claim to proceed under a theory of promissory estoppel where there was an existing contract simply because the alleged promise was made after the parties entered the contract. The License Agreement applies to the parties' rights to distribute Dr. Sheehan's technology; therefore, any purported promises relating to the distribution of his technology could not be independent of the License Agreement. See J.C. Trading, 947 F. Supp. 2d at 458 (finding that any purported agreement related to the sale of shoes could not be independent of the parties' supplier agreement to sell shoes).

The Court grants Nview's Motion for Summary Judgment with respect to Dr. Sheehan's promissory estoppel claim.

### 5. **Dr. Sheehan's Unjust Enrichment Counterclaim**

Nview seeks summary judgment on Dr. Sheehan's fourth counterclaim for unjust enrichment, arguing that unjust enrichment is precluded when there is an existing contract between the parties on the same subject matter. (Doc. # 121 at 29). Dr. Sheehan responds that he is challenging Nview's "issuance of 'certifications' to third parties for them to continue using knock-off digital versions" of the software, an issue he contends is separate from Nview's ability to enforce his copyrights against third-party infringers under the License Agreement. (Doc. # 124 at 25).

Delaware law governs Dr. Sheehan's unjust enrichment counterclaim. See Doe, 2022 WL 1447378, at *2 (stating that, under Florida law, "[t]he lex loci contractus test applies to the promissory estoppel and unjust enrichment claims as well as the breach of contract claim"); David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d 1309, 1316 (S.D. Fla. 2009) (finding unjust enrichment claim was "one in the nature of quasi-contract" and, therefore, Florida's choice of law rule regarding contracts applied (citing Lanoue v. Rizk, 987 So.2d 724, 727 (Fla. 3d DCA 2008))).

Under Delaware law, a party claiming unjust enrichment must plead and prove "(1) an enrichment, (2) an

55

impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010). "It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim." Vichi v. Koninklijke Philips Elecs. N.V., 62 A.3d 26, 58 (Del. Ch. 2012); see also Wood v. Coastal States Gas Corp., 401 A.2d 932, 942 (Del. 1979) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it."); Restatement (Third) of Restitution & Unjust Enrichment § 2 (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.").

In his counterclaim, Dr. Sheehan states that Nview has "specifically benefited through its exercise of its enforcement authority against various third parties by extracting settlement payments, sublicense fees, certification fees, or other forms of compensation." (Doc. # 47 at 72).

His unjust enrichment claim is based on the way Nview enforces its exclusive license to Dr. Sheehan's technology. In their pleadings, both parties acknowledge that Nview's right to enforce its license is governed by the License Agreement. Therefore, Dr. Sheehan cannot bring a claim for unjust enrichment based on Nview's contractual enforcement rights. See Intermec, 2021 WL 3620435, at *17 (Del. Super. Ct. Aug. 16, 2021) ("Under Delaware law . . . if recovery is possible under the contract, then the contract controls[.]" (internal quotation marks omitted)).

The Court grants Nview's Motion for Summary Judgment as to Dr. Sheehan's unjust enrichment claim.

### 6. **Dr. Sheehan's Affirmative Defenses**

Nview also seeks summary judgment on six of Dr. Sheehan's twenty-one affirmative defenses. It argues that he has not shown any evidence to support his affirmative defenses of waiver, estoppel, and antecedent breach. (Doc. # 121 at 16). Nview also argues that his claimed immunity regarding matters relating to his "professional medical judgment" and immunity related to "privileged matters within the scope of Dr. Sheehan's professional duties" are not supported by any legal authority. (Id.). It also seeks summary judgment on his twenty-first affirmative defense, that Nview's claims are

57

barred due to its "willful false advertising claims," because it is not supported by any legal authority.

Dr. Sheehan responds only to Nview's challenge of his affirmative defenses of waiver, estoppel, and antecedent breach. As to waiver and estoppel, Dr. Sheehan points to the fact that Nview referred paper and PDF customers to Dr. Sheehan for years. (Doc. # 127 at 21). As to antecedent breach, he states that the record demonstrates Nview breached its license in several ways prior to any alleged breach by Dr. Sheehan. (Id.).

The Court grants summary judgment on Dr. Sheehan's affirmative defenses that he is immune due to his "professional medical judgment," that he is immune due to "privileged matters within the scope of Dr. Sheehan's professional duties," and that Nview's claims are barred due to its "willful false advertising claims." The Court independently did not find any legal authority to support these affirmative defenses, and Dr. Sheehan does not provide any argument in his response as to why these defenses should survive. See Ryder Truck Rental v. Logistics Res. Sols., 2022 WL 1238665, at *9 (S.D. Fla. Apr. 14, 2022) (a "party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed").

The Court denies Nview's Motion for Summary Judgment on his affirmative defenses of waiver, estoppel, and antecedent breach. Nview cursorily states that Dr. Sheehan has not presented evidence in support of these defenses. (Doc. # 121 at 16). This statement alone does not prove that the nonmoving party cannot meet its burden of proof at trial. See U.S. v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama, 941 F.2d 1428, 1438 n.19 (11th Cir.1991) ("In this circuit, "[e]ven after Celotex, it is never enough simply to state that the non-moving party cannot meet its burden at trial."); Tingley Sys., Inc. v. HealthLink, Inc., 509 F. Supp. 2d 1209, 1219 (M.D. Fla. 2007) ("[The movant] has submitted no analysis of these defenses and therefore fails to meet its burden on summary judgment."); Eli Rsch., LLC v. Must Have Info Inc., No. 2:13-cv-695-SPC-CM, 2015 WL 5934632, at *3 (M.D. Fla. Oct. 6, 2015) ("In this instance, Plaintiffs merely state Dr. Sheehan has failed to provide evidence to support his affirmative defenses of waiver, estoppel, and antecedent breach. Based upon the Eleventh Circuit's ruling in Four Parcels, merely stating there is no evidence to support the affirmative defenses is not enough to prevail on summary judgment.").

### D. **Dr. Sheehan's Motion for Summary Judgment**

#### 1. **Dr. Sheehan's Rights to Distribute Paper and PDF Versions**

Dr. Sheehan seeks partial summary judgment on the issue of whether Dr. Sheehan has exclusive rights to paper and PDF versions of his technology and whether Nview infringed on his exclusive rights by selling paper and PDF versions without informing him. (Doc. # 124 at 19).

The Court has already found that the License Agreement gives Nview an exclusive license for PDF versions and a nonexclusive right to distribute paper versions of Dr. Sheehan's technology. Additionally, the Court found that Dr. Sheehan's promissory estoppel claim — in which he alleges Nview made an enforceable promise that he had the exclusive right to distribute paper and PDF versions of the technology — could not proceed. Therefore, the Court denies Dr. Sheehan's Motion as to this argument.

#### 2. **Damages Sought by Nview**

Dr. Sheehan seeks partial summary judgment on the issue of whether Nview is contractually barred from pursuing "lost profits, punitive damages, and damages related to its existing and potential relationships with third parties." (Doc. # 124 at 25). He argues that the limitation on liability

provision in the License Agreement prevents Nview from seeking any of the above damages. (Id. at 25-26). Nview argues that the damages it seeks are direct damages not barred by the contract. (Doc. # 127 at 15-16). It argues that the License Agreement only limits lost profits in the form of consequential damages. (Id. at 15). Its damages, Nview contends, stem directly from "Dr. Sheehan's interference with Nview's contractual expectancy to sell and sublicense the Technology," and, therefore, are not barred. (Id. at 16).

In its amended complaint, Nview seeks punitive damages in relation to its claims for breach of implied covenant of good faith, defamation, tortious interference with contract, tortious interference with prospective economic advantage, deceptive and unfair trade practices, and unfair competition. (Doc. # 45 at 24-25). In its prayer for relief, it does not claim to seek punitive damages for its breach of contract claim. (Id. at 24). Nview does seek lost profits in connection with Dr. Sheehan's breach of the License Agreement, (Id. at 14), and claims that Dr. Sheehan's conduct caused damage to "its relationship with its customers and potential customers," (Id. at 13, 14, 16, 17, 21).

The License Agreement states that "neither Dr. Sheehan nor Nview shall have any liability to the other party for any

indirect, special, consequential or punitive damages, including loss of profits . . . incurred by any party, whether in an action in contract (including breach of warranty), tort or otherwise." (Doc. # 121-2 at 7).

"Direct damages are those inherent in the breach and are the necessary and usual result of a defendant's wrongful act; they flow naturally and necessarily from the wrong." Indep. Realty Tr., Inc. v. USA Carrington Park 20, LLC, No. N20C-07-316, 2022 WL 625293, at *5 (Del. Super. Ct. Mar. 1, 2022). Consequential damages are "damages that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship." Id. "[T]he degree to which the damages are a foreseeable and highly probable consequence of a breach" distinguishes direct damages from consequential damages. WSFS Fin. Corp. v. Great Am. Ins. Co., No. CVN18C09088, 2019 WL 2323839, at *5 (Del. Super. Ct. May 31, 2019).

A contractual provision limiting consequential damages, "standing alone, does not preclude recovery of lost profits; that is, lost profits cannot mechanically be classified as consequential damages." Bonanza Rest. Co. v. Wink, No. CIV.A. S10C-10018, 2012 WL 1415512, at *3 (Del. Super. Ct. Apr. 17, 2012), aff'd, 65 A.3d 616 (Del. 2013). Delaware courts

distinguish "[p]rofits lost on the underlying contract itself" from "profits lost on other tangential contracts," with the former classified as direct damages and the latter as consequential damages. SLH Gen. Contractor, Inc. v. Ambience Inc., No. 4-19-001661, 2020 WL 1130325, at *6 (Del. Com. Pl. Mar. 4, 2020) (citing eCommerce Indus., Inc. v. MWA Intel., Inc., No. CV 7471-VCP, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013)). The limitation of liability provision in the License Agreement does not bar lost profits in the form of direct damages. The provision instead bars only "consequential or punitive damages, *including* loss of profits[.]" (Doc. # 121-2 at 7). The Court interprets this provision to mean that only lost profits in the form of consequential damages are barred. See Arwood v. AW Site Services, LLC, 2022 WL 973441, at *2 n.14 (Del. Ch. Mar. 31, 2022) (quoting City of Providence v. Barr, 954 F.3d 23, 41 (1st Cir. 2020)) ("In both lay and legal usage, 'include' generally signifies that what follows is a subset of what comes.").

The Court agrees with Dr. Sheehan. Nview's lost profits from its sublicenses to third parties are a textbook example of consequential damages. Its lost profits stem from other contracts or relationships — not directly from Dr. Sheehan's

alleged breach of the License Agreement. Neither party disputes that the contract bars consequential damages. Therefore, Nview cannot recover consequential damages in the form of lost profits from agreements with third parties. The Court grants Dr. Sheehan's Motion for Summary Judgment to the extent Nview seeks consequential damages in the form of lost profits from agreements with third parties.

Turning to the punitive damages that Nview seeks, the Court is not convinced that the License Agreement fully bars recovery. Nview seeks punitive damages in connection with its claims against Dr. Sheehan for defamation, intentional interference with contract, intentional interference with prospective economic advantage, and unfair competition. (Doc. # 45 at 24-25).

The parties agree that Nview's tort claims are governed by Florida law. The License Agreement's choice of law provision relates only to the parties' contractual and quasi-contractual claims; it does not encompass its tort claims. See Adios Aviation, LLC v. El Holdings I, LLC, No. 15-61218-CIV, 2015 WL 12564317, at *4 (S.D. Fla. Sept. 29, 2015) (citing Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1162 (11th Cir. 2009); Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1301 (11th Cir. 2003)) (finding that a

nearly identical choice of law provision did not extend to the tort claims in the case).

Nview points to several cases in which it claims Florida courts invalidated limitation of liability provisions when the plaintiffs sought damages for intentional torts. The cases Nview cites are not on point. In none of the cases does the court invalidate a limitation of liability that only limits punitive damages. In each of the cases Nview cites, the court invalidated a provision that sought to entirely bar damages for intentional torts. See Whitney Nat. Bank v. SDC Communities, 2010 WL 1270266, at *4 (M.D. Fla. Apr. 1, 2010) ("Clauses allowing a party to contract against liability for fraud or an intentional tort are void against public policy."); Loewe v. Seagate Homes, Inc., 987 So. 2d 758, 760 (Fla. 5th DCA 2008) ("Here, the exculpatory clause is obviously unenforceable to the extent that it attempts to release Seagate of liability for an intentional tort." (citing Kellums v. Freight Sales Centers, Inc., 467 So. 2d 816 (Fla. 5th DCA 1985)); Goyings v. Jack and Ruth Eckerd Found., 403 So. 2d 1144, 1146 (Fla. 2d DCA 1981) ("[A]n attempt by a defendant to exonerate himself from liability for an intentional tort is against public policy."); Burton v. Linotype Co., 556 So. 2d 1126, 1127 (Fla. 3d DCA 1989)

65

("Thus, the claims of Burton and MLG for damages arising from fraud and deceit and false advertising are not precluded by the exculpatory clauses contained in the lease.").

The Court is not convinced that these cases prove that a Florida court would not enforce the License Agreement's limitation of liability provision with respect to punitive damages for intentional torts. There is a significant distinction between a provision that limits *all* liability for intentional torts and one that simply prevents the plaintiff from recovering windfall damages.

The plain language of the License Agreement bars either party from seeking punitive damages in action in contract or tort. The Court grants Dr. Sheehan's Motion for Summary Judgment as to Nview's ability to seek punitive damages.

### 3.   **Dr. Sheehan's False Advertisement Claim**

Finally, Dr. Sheehan seeks summary judgment on his second counterclaim, false advertising in violation of the Lanham Act, arguing that "[t]here is no genuine material factual dispute that Nview's advertising at times included literally false statements[.]" (Doc. # 124 at 27).

The Court has already determined that Dr. Sheehan lacks standing for this claim. Therefore, the Court denies Dr. Sheehan's Motion as to this part.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Nview's <u>Daubert</u> Motion (Doc. # 122) is **DENIED.**

(2)  Dr. Sheehan's <u>Daubert</u> Motion (Doc. # 123) is **DENIED.**

(3)  Nview's Motion for Summary Judgment (Doc. # 121) is **GRANTED** as to the following claims and issues:

     a. Nview's Count XI (Declaratory Relief) is granted.

     b. Dr. Sheehan's first counterclaim for breach of the implied duty of good faith and fair dealing is dismissed.

     c. Dr. Sheehan's request for declaratory relief in his first counterclaim is dismissed.

     d. Dr. Sheehan's second counterclaim (false advertising in violation of the Lanham Act) is dismissed.

     e. Dr. Sheehan's third counterclaim (promissory estoppel) is dismissed.

     f. Dr. Sheehan's fourth counterclaim (unjust enrichment) is dismissed.

     g. Dr. Sheehan's seventh (immunity due to medical judgment), eighth (immunity due to privileged matters within the scope of professional

duties), and twenty-first (false advertising) affirmative defenses are dismissed.

(3)  Nview's Motion for Summary Judgment (Doc. # 121) is **DENIED** as to the following:

   a. Dr. Sheehan's first counterclaim alleging express breach of contract and requesting injunctive relief.

   b. Dr. Sheehan's affirmative defenses of waiver, estoppel, and breach.

(4)  Dr. Sheehan's Motion for Summary Judgment (Doc. # 124) is **GRANTED** as to Nview's attempt to seek consequential and punitive damages barred under the License Agreement.

(5)  Dr. Sheehan's Motion for Summary Judgment (Doc. # 124) is **DENIED** in all other respects.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 14th day of November, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE